TRYPHOSIA EATON, Executrix of Estate of HENRY EATON, deceased Appellant, v. THE J. B. CROWE COAL & MINING CO., Respondent.

Kansas City Court of Appeals, April 6, 1914.

SALES: Contracts: Breach: Damages. Plaintiff had a contract with defendant to buy 50 carloads of coal as ordered during the season. Only 5 were delivered, and, although plaintiff frequently ordered and begged for coal, it was not furnished, and to fill orders plaintiff had contracted for, plaintiff had to buy the remaining 45 cars elsewhere at an advanced price ranging from $2 to $3 per ton. Plaintiff had a contract for 50 cars from another company and it also defaulted on its contract and plaintiff recovered damages from it in another suit. The evidence was that he was compelled to buy 100 cars to cover the shortage caused by the failure of both companies to comply with their contracts and that an average car contains 30 tons of coal. *Held*, that in order to recover, it was not necessary to specify for what shortage any particular car was purchased, and that a failure to specify which shortage any

particular car was bought to fill would not debar plaintiff from recovery. The fact that during the period in which the coal was ordered and not furnished the price of coal rose steadily would not make plaintiff's damage so indefinite as to be incapable of computation, since the trier of fact could arrive at an average excess of price above the original contract price, and plaintiff's damage could be determined by multiplying the number of tons plaintiff was compelled to buy on account of defendant's breach by the average excess of price over the price agreed upon.

Appeal from Jackson Circuit Court.—*Hon.* W. O. *Thomas*, Judge.

REVERSED AND REMANDED.

*Joseph S. Rust* and *Hamlin & Seawell* for appellant.

*Boyle & Howell* and *Joseph S. Brooks* for respondent.

TRIMBLE, J.—This case was here once before. [Eaton v. Crowe Coal and Mining Company, 161 Mo. App. 30.] As stated in that opinion, the suit is for damages for failure to deliver forty-five carloads of coal according to contract. A judgment for defendant on that trial was reversed because this court held that the evidence conclusively showed that the failure to deliver the coal was not on account of a shortage of cars, (for which defendant would not be liable under the contract), but by reason of causes for which it was liable. The court further held that while there was no evidence as to the number of tons of coal defendant failed to deliver, yet, as it did fail to deliver some for causes for which it was liable, and plaintiff was damaged thereby, the latter was entitled to nominal damages. And, as the case had to be reversed, it would be remanded for another trial so that the evidence as to the number of tons defendant failed to de-

liver could be presented, in which case substantial damages would be allowed.

Upon a retrial before the court without a jury, the court found for plaintiff for nominal damages only, and rendered judgment in his favor for $1. After this judgment plaintiff died and the cause was revived and appeal taken in the name of his executrix.

The basis of the court's finding is to be gathered from the two declarations of law given in defendant's behalf. One of which, number five, is as follows:

"The court declares the law to be that there is no evidence as to the number of tons of coal defendant failed to deliver plaintiff, and, therefore, there is no basis upon which the court can estimate damages, if plaintiff was entitled to damages."

In order to determine whether the giving of the foregoing declaration was correct or not, it is necessary to understand the contract made by the parties and the evidence given. The contract was made by correspondence. On the part of plaintiff it consisted of an order, No. 233, signed by Henry Eaton, dated September 11, 1902, addressed to defendant at Kansas City, Missouri, directing it to ship to Henry Eaton, Springfield, Missouri, over the St. Louis and San Francisco railroad, "as ordered during season, not to exceed one car per day, fifty cars of Weir City Lump Coal at $1.75 per ton f. o. b. cars at mines."

This order was accepted by defendant in a letter dated September 13, 1902, addressed to Henry Eaton saying, among other things, "We are in receipt of your order No. 233 for fifty cars of Weir City Lump for which we are greatly obliged. We will see to it that good coal is furnished you and *prompt shipment* made of it."

On September 18, 1902, defendant wrote plaintiff: "You may consider yourself fortunate in the purchase of Lump coal on order recently given, as the price has been advanced to $2 on Lump and $1.75 on Nut f. o. b.

mines.'' This, and the letter of acceptance, clearly and conclusively show that the order was a contract for the delivery of fifty cars of coal ''as ordered during the season, not to exceed one car per day.'' It is agreed that ''during the season'' as used in the contract meant that part of the year between the first of September and the first of April. On the letter of September 13th, accepting the order, was the statement, ''all orders and contracts subject to car supply, strikes, accident and causes beyond our control.'' And regardless of the effect of this statement, there was a trade custom that every order is taken subject to such conditions.

While the order was a conditional one as contended by defendant, yet, the only conditional feature about it was the element of car shortage, strikes, etc. It was unconditional as to the number of cars agreed to be taken and delivered. Delivery was to be made as ordered not to exceed one car per day and this meant delivery within a reasonable time after each order. The conditional feature that the order was subject to car shortage is not important at this time, since the trial court refused a declaration asked by defendant to the effect that the failure to deliver coal was due solely to a shortage of cars and not to a shortage of coal. In its oral evidence defendant attempted to explain that the real cause of its failure to deliver was because of a shortage of cars supplied by the railroad and not on account of a shortage in its coal production; that, under the conditions under which mining is carried on, no coal can be mined beyond the amount required to fill the cars that are furnished; that when there are no cars no coal can be mined, as the miners will not mine the coal, and the coal, if mined and stored, will slack and become less valuable. This fact may be true enough in itself, but, if a shortage of cars was the real reason why defendant failed to deliver the coal, it is incomprehensible why defendant did not

say so in its correspondence. Instead of doing so, however, in every letter it stated, as a reason for not delivering the coal, that the railroad was using their entire output and confiscating the coal defendant was billing to its other customers. And there was evidence that when plaintiff could not get the coal from defendant he had contracted for at $1.75 per ton, he obtained it at an advanced price from others, shipped over the same railroad. So that, other mines on the same line of railroad were having no trouble to get cars, at least cars in which to ship coal that was being sold at the current market price.

Going back now to the question of the correctness of the court's ruling in giving declaration number five above quoted, the record shows that on October 8, 1902, plaintiff wrote defendant, "I telephoned the mines several days ago to ship me one car lump coal *every day until further orders.* Please rush my order as I am running short." The defendant replied next day. "Your favor at hand. Beg to advise we are making every effort possible to fill orders, but the railroad company confiscates our entire output. However, I have written the mines to day to make every effort to ship you some lump coal. Beg to advise that the selling price has advanced to $2.25 per ton on Lump . . . We trust that you will appreciate our efforts and the position we are placed in, as we will do the best we can for you." Here was an order to ship one car a day until further orders. But this order was not complied with except possibly as to the five cars plaintiff received from defendant. From October 8th until November 5th was twenty-seven days, and yet, if any cars were furnished at all during that time, there were only five furnished. And during that time the price of coal was $2.25 per ton f. o. b. mines. Between October 8th and November 5, 1902, defendant must have shipped plaintiff the five cars he admits having received of the fifty called for in the contract.

It is not exactly clear from the record just when these five cars were shipped, but it is a fair inference that they were shipped between October 9th and November 5, because on the last named date, plaintiff wrote defendant to "Hold all shipments until further orders, as I have no room to unload." And there is no evidence that any cars were received after that date.

To the letter of November 5th, defendant on the 8th wrote: "We are in receipt of your favor of the 5th instant, advising us to hold shipment of coal to you until further advised, and will comply with your request. Awaiting your further kind favors, we remain, etc."

The next order, as shown by the record, is a telegram from plaintiff to defendant December 2, 1902, to "rush lump. Entirely out." Defendant replied to this on the same day, saying "We are in receipt of your wire of this date requesting us . . . to rush lump, as you were entirely out. . . . We will do all in our power to rush some lump coal to you, but it seems like when we get about caught up on the railroad order and it looks very flattering for furnishing lump coal on commercial orders, they will invariably increase their order and put us behind again. Mr. Fulton is at the mines today and is trying to make arrangements whereby he can secure some lump coal to take care of our gilt-edge customers, of which you stand near the head of the list. Trusting that the situation will change, at least before we have any severe weather, and awaiting your further kind favors, we remain,".

On December 8, 1902, plaintiff wired defendant: "I am out of coal. Contracts on my hands. Ship today. Answer." And on the same day defendant replied, "Railroad taking all lump we make. Will do very best can." In response to this, plaintiff, on December 9th, wrote: "Replying to your telegram of the 8th will say I must have some lump coal, as I have

contract that I can't fall down on. When Mr. Cease was here on his last trip . . . I told him to start shipping at once, and that was during the warm spell. Hoping you will see your way clear and ship me about five cars a week, I remain,

> Yours truly,
> HENRY EATON."

Here was a letter on December 9th ordering five carloads of coal per week and none were furnished, and the order was never countermanded and the time in which, according to the contract, the coal was to be furnished would not expire until April 1, a period of three months and twenty-two days. If defendant had complied with this order the contract could have been performed in nine weeks, and during this nine weeks the price of coal gradually increased from $2.25 to $2.50 and then to $3 per ton and the coal bought at those prices was not as good as the lump coal called for in the contract.

On the same day, to-wit, December 9, 1902, plaintiff wrote defendant another letter as follows: "I wired you yesterday for coal and received answer but you do not give me much satisfaction as to shipment. Now as I wired you I am out and of course my only show to get coal is from people I contracted with. You can easily see how much I have had on my contract. I will advance the money if that will forward the coal. It does look as though you could give me two cars a week on this contract. Let me hear from you." Here was a second letter stating he was out of coal and appealing to defendant to ship him at least two cars a week on the contract. He was hoping defendant would ship him five cars a week, but, if he could not get that, he was begging for at least two cars a week.

To the first of plaintiff's letters written on the 9th, defendant replied on December 10th, as follows: "Your favor of the 9th received. In answer will say the management is doing everything possible to get

you some lump coal and the mines are instructed to let you have some of the very first coal that the railroad company will let go. They are at the present time taking every pound of lump coal we produce. I feel, however, that these conditions will soon change and we will be able to ship you the amount you ask for. I regret exceedingly that conditions are this way and will ask you to bear with us for a short while, when I think, as above stated, we will be able to supply you." And to the second of said letters, defendant, on the same day, December 10th, answered: "Your letter 9th. I realize that my telegram of the 8th was not very comforting to you, but the fact is, the railroad company is taking every pound of lump coal we make, and although we have made repeated appeals to them to allow us to ship some lump coal commercially, they have so far ignored our request. This morning I telegraphed the Superintendent of the Frisco, on whose division our mines are located, and asked him if he would not allow us to bill some lump coal commercially today, and if he does we will ship you a car, but if he refuses, I am sure I do not know what else can be done, as I have exhausted all means of securing coal for you from other directions that would anywhere near let us out even. I thoroughly appreciate what a disappointment it is to you to have us fail to fill the contract we made with you, but at the time we took your order we had no idea that the railroad company would get in such shape that they would have to take all of our coal. I will write you again within the next few days, if I see any improvement in the situation.

The plaintiff still being unable to get any coal on his contract, wrote again on December 18, 1902, as follows: "When I met Mr. Cease a few days ago I thought most certainly that I would get one or two cars of coal by this time, as I have some contracts that I must provide for, so please try and give me one or

two cars at least this week. If the price has anything to do with it let me know, as I must have coal.''

Here he was begging defendant to get him one or two cars at least this week. To this defendant replied on the 20th, "Your letter 18th. When Mr. Cease saw you we fully expected that we would be able to ship you some lump coal within a few days, but the Frisco Railroad is just as short now as it ever was and is taking all we make. It is not a question of price, as we stand ready and willing to furnish you the coal at the price you contracted with us to pay for it, and we shall certainly do so as soon as we are permitted by the railroad company to ship any, but if you feel that you would rather pay more for it if you have to, and get it somewhere else, we shall not feel badly about it, but we entered into the contract with you in good faith and have been doing everything in our power to get the coal with which to fill it.'' On the same day defendant wrote this letter, December 20th, plaintiff wrote defendant's selling agent, Mr. Cease, the man who secured plaintiff's original order. "I have this day notified J. R. Crowe C. Co. what my intentions is regarding the contract I have with them for fifty cars of coal I bought September 11 at 1.75. You are well aware that I made contracts on this basis and of course I am filling them with $2.50 coal. Now, all I am demanding is the coal according to contract both verbal and written. If it can't be fulfilled, I want the difference in the price. This is only a fair business proposition. I have always wanted to be on friendly terms with all the operators but unless this contract is carried out friendship ceases & I am going to bring suit & see who is responsible. I am free to say that the price cuts the main figure in this business.''

To this defendant replied on December 24th: ''Upon my return to town I find your letter of the 20th, and also one addressed to Mr. Cease under same date. As I have previously explained to you, we are not fail-

ing to fill your order on account of selling our coal elsewhere at higher prices, but simply because the railroad company is taking all the lump coal we make. We shall of course be very sorry to get into the courts with you on account of our failure to ship you the coal you ordered from us, but of course that is a matter for you to decide. . . . I want to again assure you that we will ship you the coal just as soon as we can possibly do so, but because we are making none other than that used by the railroad company, we cannot ship it at present.''

On December 26th, plaintiff wrote, in answer to defendant's letter of the 20th, ''Yours of the 20th received. And in reply would say that it has always been the same old song when coal is high—I notice that I have to fulfill all of the contracts that I made, regardless of what it costs, and am doing it now in order to settle this matter for all future time. I am going to test it in the courts & will abide by the results.''

It is not denied that defendant delivered only five of the fifty cars contracted for. The evidence also shows without dispute that the average car of coal shipped over the Frisco road from that locality contained thirty tons. It is also undisputed that the market price of coal increased from $1.75 per ton f. o. b. mines at the time the contract was made to $2 per ton within five days after said contract was accepted and closed, and that coal continued to increase in price until October 9th when it was $2.25 per ton f. o. b. mines, and continued thereafter to rise until January when it was $3 per ton and remained at that price throughout January, February and until the middle of March when it dropped again to $2.50 per ton. During December, as hereinbefore stated, the price ranged from $2.25 to $2.50 per ton.

From the foregoing we think it will appear that there was evidence as to the number of tons of coal defendant failed to deliver to plaintiff and, therefore,

there was a basis upon which the court could have estimated the damages, and that plaintiff was clearly entitled to more than a judgment for merely nominal damages. And that, therefore, it was error to give declaration of law number five. The letter of December 9th was an order for five cars of coal per week and was not countermanded by the second letter of the same day in which plaintiff, in effect, begged defendant to send him two cars per week if he could not get the five. Even at the rate of two cars per week, there was ample time to comply with the contract between December 9th and April 1st. And although the price of coal which plaintiff was compelled to buy, to take the place of the coal defendant failed to deliver, ran on a sliding scale steadily upward from $2.25 to $3 per ton, yet this would not prevent the court from arriving at a general average of price during the time the coal should have been but was not delivered, and multiplying the average price by the number of tons failed to be delivered. Of course the measure of plaintiff's damage would be the amount, in excess of the price he had contracted for, which plaintiff was compelled to pay for coal to supply the deficiency caused by defendant's default or breach. But there was evidence that he had to buy the entire number of cars he failed to receive from defendant. There was some attempt on the part of the defendant to show that plaintiff had also a contract with another coal company which it failed to perform, and that plaintiff recovered damages from it, and that, as plaintiff could not tell whether particular cars of coal he bought to supply his deficiency, were to supply the shortage caused by this other company's failure to perform or the deficiency caused by defendant's default, therefore, plaintiff's evidence was either not sufficiently definite to entitle him to recover, or that the coal he bought was not to supply the place of coal due from this defendant but to supply the deficiency due from the other company, and plaintiff could not

claim the same damages from both companies. But the evidence shows that he had a contract with this other company for fifty cars and also with defendant for fifty cars, and that he was compelled to buy 100 cars to supply the deficiency. In other words, he was compelled to buy coal sufficient to cover the deficiency caused by the default in both contracts. Under these circumstances it was immaterial whether or not he could specify for which deficiency or default he was compelled to buy any particular car.

Hence, it was error for the court to give, in defendant's behalf, declaration of law No. 11 which declared that the court could not determine the amount of coal plaintiff had to buy in the open market because the coal he bought to supply the shortage under the other company's contract was intermingled with the coal bought to supply the shortage under the contract with defendant. It will be noted that the court does not say it does not believe plaintiff's testimony to the effect that he had to buy coal sufficient to cover both contracts. And by refusing the declaration saying the failure to deliver was on account of a car shortage, the court clearly held that it was not on that account.

Plaintiff offered evidence showing a breached contract, and also evidence that he was substantially damaged. The court does not refuse to credit or believe this evidence, but, on an erroneous theory of the law, holds that the amount of such damage is not computable. Consequently, the judgment must be reversed and the cause remanded for another trial. It is so ordered. All concur.